UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENNIS BRENNAN,

     Plaintiff,

v.                                       CASE NO: 8:07-cv-1848-T-23TGW

THE ROMAN CATHOLIC DIOCESE
OF SYRACUSE, NEW YORK, INC.,

     Defendant.

_____/

## **ORDER**

     Dennis Brennan sues the Roman Catholic Diocese of Syracuse, New York, Inc., (the "Diocese") for breach of contract, fraud, and intentional infliction of emotional distress. The defendant moves (Doc. 6) to dismiss for lack of personal jurisdiction or, in the alternative, to transfer. Brennan responds (Doc. 11) in opposition.

### Background

     A citizen of Florida, Brennan resides in Pinellas County. The Diocese, a citizen of New York, resides in Syracuse. (Docs. 1 and 2) In 2001, Brennan recovered a memory, suppressed for more than four decades, of his childhood rape in Syracuse by a Roman Catholic priest. (Doc. 1, ¶¶ 7-8) In January, 2002, Brennan contacted the Diocesan Bishop Thomas Costello ("Bishop Costello"), "who verbally agreed that the [Diocese] would pay for counseling for Brennan, in the State of Florida." (Doc. 1, ¶ 10) In April, 2002, Brennan began attending counseling sessions with Dr. Mary D. Lutzo ("Dr. Lutzo"), a psychologist, at her St. Petersburg office. (Doc. 12, Ex. B, ¶ 11) On April 29, 2002, Dr. Lutzo requested and obtained Bishop Costello's approval of a

therapy known as Eye Movement Desensitization and Reprocessing ("EMDR").

(Doc. 12, Ex. B, ¶ 12) During a May 28, 2002, telephone call, Dr. Lutzo recommended

continuation of Brennan's treatment, and Bishop Costello agreed.  (Doc. 12, Ex. B,

¶ 13)  On June 26, 2002, after receiving Dr. Lutzo's invoice, Bishop Costello told Dr.

Lutzo that the Diocese "would agree to continued therapy."  (Doc. 12, Ex. B, ¶ 15)  The

Diocese periodically paid Dr. Lutzo in St. Petersburg.  (Doc. 1, ¶ 11; Doc. 12, Ex. B,

¶ 11)

After several months of counseling, in February, 2003, Brennan demanded a

monetary settlement from the Diocese.  (Doc. 1, ¶ 12)  In a March 17, 2003, letter, the

Diocese's victim assistance coordinator, Teresa Secreti ("Secreti"), acknowledged

Brennan's accusation of sexual abuse, requested Brennan's medical records, and

authorized therapy through April 15, 2003, to afford "us time to review the records."

(Doc. 1, ¶¶ 12-13, Ex. A)  Although the Diocese never renewed the authorization, Dr.

Lutzo continued to treat Brennan.  (Doc. 12, Ex. B, ¶ 32)

In a January 5, 2004, letter to Bishop Costello, Dr. Lutzo requested payment for

counseling from April 23, 2003, through July 9, 2003.  (Doc. 12, Ex. B, ¶ 33)  Secreti

responded by informing Dr. Lutzo that the Diocese "will make the final payment of

$1,450.00 as a continuation of our earlier cooperation."  (Doc. 12, Ex. B, ¶ 38)  Dr.

Lutzo continued to treat Brennan and again requested payment in June, 2005.  Secreti

told Dr. Lutzo that the Diocese declined to resume payment without "a letter stating that

any potential legal process against the Diocese of Syracuse was stopped."  (Doc. 12,

Ex. B, ¶ 50)  Dr. Lutzo directed the Diocese to Brennan to discuss "the legal process."

(Doc. 12, Ex. B, ¶ 50)  Notwithstanding Brennan's failure to send the requested letter, the Diocese paid Dr. Lutzo in August, 2005.  (Doc. 12, Ex. B, ¶ 50)

During the summer of 2005, Brennan commenced an anti-depressant medication regimen "advised" by Secreti.  (Doc. 1, ¶ 24)  Dr. Lutzo referred Brennan to Dr. Walter Griffith, a St. Petersburg psychiatrist, "to monitor his reaction to the anti-depressant medications."  (Doc. 1, ¶ 24; Doc. 12, Ex. B, ¶ 61)  Dr. Griffith evaluated Brennan and referred him to Dr. Karen Moorhead, a clinical psychologist, for further testing.  (Doc. 1, ¶¶ 27-28)  In an October 9, 2006, letter to Secreti, Dr. Lutzo requested that Brennan "be allowed to see Dr. Moorhead."  (Doc. 1, ¶ 29)  In a November 1, 2006, letter to the Diocese, Brennan explained that his health insurance required a $500 "out-of-network" co-payment for the testing.  (Doc. 1, ¶ 31; Doc. 12, Ex. 6)  Brennan wrote that "[w]hile I do not agree that I should have to use my insurance to pay for any of this, I have been willing to do so and meet the diocese half way."  (Doc. 12, Ex. 6)  Secreti called Dr. Lutzo and "told her that the [Diocese] would pay the $500 to Dr. Moorhead."  (Doc. 1, ¶ 32)  After examining Brennan on November 14, 2006, Dr. Moorhead concluded that Brennan suffered from depression and a "failure to thrive."  (Doc. 1, ¶¶ 32-33)

In a November 21, 2006, letter to Secreti, Brennan requested reimbursement in the amount of $1,418.46 (the $500 co-payment plus an aggregate prescription co-payment of $918.46).  (Doc. 1, ¶ 35; Doc. 12, Ex. 7)  Receiving neither a response nor reimbursement, Brennan left a message for Secreti on January 8, 2007.  (Doc. 12, Ex. 8)  Secreti returned Brennan's call the next day.  Brennan explains that "[w]hen I asked her when I could expect reimbursement, Ms. Secreti stated that it was the policy of the Diocese of Syracuse not to pay any co-pays incurred by victims of abuse like

myself."  (Doc. 12, Ex. 8)  When Brennan "questioned this alleged policy, Ms. Secreti

stated that the diocese was waiting for Dr. Moorhead's report before deciding whether to

pay my out-of-pocket co-pays."  (Doc. 12, Ex. 8)  In a January 9, 2007, letter to Bishop

Costello, Brennan requested reimbursement of $2,478.46 ($1,418.46 plus an additional

$1,060.00 paid to Dr. Moorhead).  (Doc. 12, Ex. 8)

On April 6, 2007, Dr. Lutzo sent the Diocese the outline of a therapeutic plan for

Brennan.  Endorsed by Dr. Lutzo, Dr. Moorhead, and Dr. Griffith, the plan included six-

weeks of intensive, residential therapy in New Mexico.  (Doc. 1, ¶ 37, Ex. J)  On

April 25, 2007, Brennan called Secreti regarding payment of his medical expenses and

approval of the residential program.  (Doc. 12, Ex. A, ¶ 27)  Secreti explained that the

Diocese had not decided about the residential program but Secreti did not mention the

medical bills.  (Doc. 12, Ex. A, ¶ 27)  On or about April 25, 2007, Secreti called Dr.

Lutzo to confirm her receipt of the treatment plan.  (Doc. 12, Ex. B, ¶ 69)  Noting that

Brennan "has been concerned about payment of medical bills," Secreti asked Dr. Lutzo

"to tell [Brennan] that the Diocese of Syracuse would pay for anything not covered by

his insurance."  (Doc. 12, Ex. B, ¶ 69)  Dr. Lutzo responded that she "didn't know what

bills [Secreti] was specifically referring to" but that she would convey the message to

Brennan.  (Doc. 12, Ex. B, ¶ 69)

On April 27, 2007, Secreti informed Brennan that the Diocese still had not made a

decision about the residential program; however, Secreti did not mention the medical

bills.  (Doc. 12, Ex. B, ¶ 28)  Sometime after June 18, 2007, Brennan called Secreti,

who explained "that she had 'tentative verbal approval to continue with out-patient

counseling' as recommended by Dr. Moorhead" in an earlier psychological evaluation.

- 4 -

(Doc. 1, ¶ 38)  When Brennan pressed her about the residential program, Secreti

requested authorization to review Brennan's medical records.  (Doc. 1, ¶ 38)   After

reviewing the records, Secreti told Brennan the Diocese "was going to go with Dr.

Moorhead's 'original recommendation' of continued out-patient therapy."  (Doc. 1, ¶ 40)

     In a June 26, 2007, letter, Secreti wrote that "[a]lthough we are unable to assist

with th[e] request [for residential treatment], the diocese will provide reimbursement for

counseling as stated in the original recommendation made by Dr. Moorhead."  (Doc. 1,

¶ 41, Ex. L)  Secreti wrote, "[P]lease know we are concerned for you and we are

committed to providing the continued assistance in your healing process."  (Doc. 12,

Ex. 10)  About two months after Brennan initiated this action, the Diocese sent a final

payment to Dr. Lutzo to cover Brennan's counseling through November 14, 2007.  (Doc.

12, Ex. B, ¶ 81)

<u>Florida's Long-Arm Statute</u>

     Brennan agrees that a basis for personal jurisdiction exists under section

48.193(1)(b), Florida Statutes, which provides that "[c]ommitting a tortious act within

[Florida]" subjects a defendant to personal jurisdiction in Florida.  No physical presence

is required if the tort causes an injury in Florida.  <u>Wendt v. Horowitz</u>, 822 So. 2d 1252,

1260 (Fla. 2002).  "[T]elephonic, electronic, or written communications into Florida"

provide a basis for jurisdiction if the tort arises from the communications and "'depend[s]

upon proof of either the existence or the content of any of the communications.'"

<u>Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.</u>, 421 F.3d 1162, 1168 (11th

Cir. 2005) (quoting <u>Carlyle v. Palm Beach Polo Holdings, Inc.</u>, 842 So. 2d 1013, 1017

(Fla. 4th DCA 2003)); <u>Wendt</u>, 822 So. 2d at 1260.  Brennan alleges that the Diocese

communicated via telephone and mail with Brennan and his agent, Dr. Lutzo, both located in Florida.  The fraud claim and intentional infliction of emotional distress claim allegedly arose from the communication and depend upon proof of the existence and content of the communication.  Assuming the complaint alleges a claim for fraud and for emotional distress, section 48.193(1)(b) provides a basis for jurisdiction.

Brennan argues that a basis for personal jurisdiction exists under section 48.193(1)(g), which provides that "[b]reaching a contract in [Florida] by failing to perform acts required by the contract to be performed in [Florida]," subjects a defendant to the jurisdiction of a Florida court.  Brennan must state a claim for breach of contract.  See Interfase Mktg., Inc. v. Pioneer Techs. Group, Inc., 774 F. Supp. 1355, 1356-57 (M.D. Fla. 1991).  If Brennan alleges an express promise to pay money and the contract states no place of payment, the defendant's breach of contract occurs in Brennan's domicile.  Venetian Salami Co. v. Parthenais, 554 So. 2d 499, 503 (Fla. 1989); Balboa v. Assante, 958 So. 2d 573, 574 (Fla. 4th DCA 2007).  Because the purported contract in the present case states no place of payment, the breach occurred, if at all, in Brennan's domicile, Florida.  Thus, section 48.193(1)(g) ostensibly provides a basis for jurisdiction.

Although the threshold question is whether the complaint alleges a claim for relief, the claims for fraud and intentional infliction of emotional distress are noticeably dubious in sufficiency and, although more plausible, the claim for breach of contract, based on a series of ambiguous exchanges in an unusual context, is similarly suspect.  A final determination of the sufficiency of each claim implies considerable judicial labor and, possibly, a merely conditional result.  Of course, if no claim is stated, Florida's long-arm

statute provides no mechanism of jurisdiction over a non-resident.  If a claim is stated,

the question recurs whether personal jurisdiction in Florida offends due process of law.

This order assumes without deciding both the truth of the facts Brennan alleges and the

sufficiency of the allegations supporting the asserted claims for relief.  As stated in

Future Technology Today, Inc. v. OSF Healthcare Systems, 218 F.3d 1247, 1250 (11th

Cir. 2000):

> In order to determine whether a tort was not committed by the defendant, this Court would have to conduct a full-scale inquiry into the nature of the document taken, an interpretation of the contract, and a determination on the merits.  A motion to dismiss for lack of personal jurisdiction does not require such an inquiry.  The plaintiff has alleged the conversion, and the record is in dispute as to the truth of the accusation, therefore the Court will construe the facts in the light most favorable to the plaintiff and hold that the alleged conversion satisfies Florida's statute on long-arm jurisdiction.

Indulging a similar assumption, this order proceeds to the jurisdictional issue.

### Minimum Contacts and Due Process

Proceeding from Milliken v. Meyer, 311 U.S. 457 (1941), and further abandoning

the requirement in Pennoyer v. Neff, 95 U.S. 714 (1877), for a defendant's presence in

a state to warrant personal jurisdiction in the state, International Shoe Co. v. State of

Washington, 326 U.S. 310 (1945), expounds the foundational elements of the "minimum

contacts" constitutionally essential to subjecting a non-resident defendant to suit in a

state:

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." .
> . . .
>
>      . . . Those demands may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the

particular suit which is brought there.  An "estimate of the inconveniences" which would result to the corporation from a trial away from its "home" or principal place of business is relevant in this connection.

. . . [I]t has been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there. . . .

. . . .

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of the state.  The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue. . . .

326 U.S. at 316-17, 319.[1]

In <u>Hanson v. Denckla</u>, 357 U.S. 235 (1958), an interstate controversy arose from the administration of a trust established in Delaware and invalidated in Florida based on jurisdiction allegedly arising from the settlor's later domicile in Florida, the settlor's intermittent receipt of trust income in Florida, and "several bits of trust administration" that occurred in Florida.  Concluding that the non-resident trustee lacked sufficient "affiliating circumstances without which the courts of a state may not enter a judgment," 357 U.S. at 246, <u>Hanson</u> rejects the notion that the trend of flexibility traceable through <u>Pennoyer</u>, <u>Milliken</u>, <u>International Shoe</u>, and other cases "heralds the eventual demise of all restrictions on the personal jurisdiction of state courts."  357 U.S. at 251.  Rather,

---

[1] The constitutional standard of <u>International Shoe</u> governs also the extension of "legislative jurisdiction" over non-resident persons and events outside the legislating state.  <u>Quill Corp. v. North Dakota</u>, 504 U.S. 298 (1992); <u>Allstate Ins. Co. v. Hague</u>, 449 U.S. 302 (1981); <u>Gerling Global Reinsurance Corp. of America v. Gallagher</u>, 267 F.3d 1228 (11th Cir. 2001); <u>American Charities v. Pinellas County</u>, 221 F.3d 1211 (11th Cir. 2000).  Jurisdiction under Rule 4(k)(2), Federal Rules of Civil Procedure, requires compliance with <u>International Shoe</u>.  <u>Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.</u>, 197 F.3d 1070, 1074-75 (11th Cir. 1999).  <u>See also</u> <u>Securities and Exchange Commission v. Carrillo</u>, 115 F.3d 1540 (11th Cir. 1977).

Hanson prescribes an irreducible minimum in the requisite "affiliation" of a foreign defendant with the forum state and acknowledges that the requisite "affiliation" is an inherent "consequence of territorial limitations on the power of the respective states." 357 U.S. at 251.  In the course of this prescription, Hanson iterates an element of the still-governing standard, which in Hanson precludes Florida's exercise of jurisdiction based on, for example, the settlor's execution of the appointment power in Florida. Establishing permanently the requirement of "purposeful availment" of the forum state by a non-resident defendant, Hanson explains that

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.  The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. . . .

357 U.S. at 253.  See also Kulko v. Superior Court of California, 436 U.S. 84, 95 (1978) ("A father [in New York] who agrees, in the interest of family harmony and his children's preferences, to allow them to spend more time in California than was required by a separation agreement can hardly be said to have 'purposely availed himself' of the 'benefits and protections' of California's laws.")

In World-Wide Volkswagen v. Woodson, 444 U.S. 286 (1980), the New York defendant, a distributor of Volkswagens, sold a Volkswagen in New York to a New York resident, who a year later moved to Arizona but received injuries in an automobile accident while driving the Volkswagen in Oklahoma, with which state the New York Volkswagen distributor had no affiliation except that this customer drove the Volkswagen through Oklahoma in transit to Arizona.  In an Oklahoma lawsuit, the

customer alleged a claim for product liability, and the Supreme Court of Oklahoma

rejected the New York defendant's challenge to Oklahoma's assertion of personal

jurisdiction.  Reversing and restating the need for "reasonableness" and "fairness" in a

state's assertion of jurisdiction over a non-resident, <u>World-Wide Volkswagen</u> forges the

principle that "foreseeability" is a necessary but not a sufficient predicate for personal

jurisdiction.  Accompanying the requirement of foreseeability is the imperative of a

defendant's "purposeful availment" of access to, and the benefit of, a state, which

renders the extension of jurisdiction "foreseeable" and, consequently, accords with due

process:

> Even if the defendant would suffer minimal or no inconvenience from being
> forced to litigate before the tribunals of another State; even if the forum
> State has a strong interest in applying its law to the controversy; even if the
> forum State is the most convenient location for litigation, the Due Process
> Clause, acting as an instrument of interstate federalism, may sometimes
> act to divest the State of its power to render a valid judgment.
>
>    . . . .
>
>    . . . [T]he foreseeability that is critical to due process analysis is not
> the mere likelihood that a product will find its way into the forum State.
> Rather, it is that the defendant's conduct and connections with the forum
> State are such that he should reasonably anticipate being haled into court
> there. . . .

444 U.S. at 294, 297.

In <u>Shaffer v. Heitner</u>, 433 U.S. 186 (1977), which contributes importantly to the

current due process standard, a Delaware shareholder brought a derivative action

against a Delaware corporation, a subsidiary, and sundry officers and directors, some of

whom were non-residents and conducted no activity in Delaware.  The plaintiff sought

and obtained a sequestration order against the non-residents' corporate shares,

warrants, and other valuable property appurtenant to stock ownership.  <u>Shaffer</u> squarely

decides that the standard for asserting personal jurisdiction and the standard for asserting in rem (or quasi in rem) jurisdiction are identical and that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in International Shoe and its progeny," 433 U.S. at 212, which includes "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the states on which the rule of Pennoyer rests,"  433 U.S. at 204.  In his concurrence, Justice Stevens introduced the lasting notion that "the requirement of fair notice . . . includes fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereign."  433 U.S. at 218.  See also Rush v. Savchuk, 444 U.S. 320 (1980) (the presence in Minnesota of the plaintiff and the insurer of an Indiana defendant fails to justify personal jurisdiction in Minnesota in an action arising from an automobile accident in Indiana); Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408 (1984) (travel to and negotiation in Texas, plus purchase of supplies in Texas, insufficient for personal jurisdiction over Colombian helicopter company); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984) (regular circulation of magazine in a state is not "random, isolated, or fortuitous" and constitutes "minimum contacts" based on publication "purposefully directed at New Hampshire").

In Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), Michigan residents contracted with a Florida-based franchisor to operate a restaurant in Michigan.  The franchise agreement required payment of franchise fees, royalties, rent, and sales and promotional costs to the franchisor in Florida and subjected the Michigan restaurant to a pervasive and "exacting regulation" by the franchisor (originating in the Florida office and enforced by a district office).  471 U.S. at 465.  Further developing the "applicable

due process" standard, <u>Burger King</u> finds that the "foreseeability" by a non-resident of litigation in the forum state is "critical to the due process analysis," 471 U.S. at 474, and that "foreseeability" depends importantly on the non-resident's "purposeful availment" of the privilege of activities in the forum state:

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts  or of the "unilateral activity of another party or a third person.  Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.  Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

471 U.S. at 475-76.  (citations omitted)  <u>Burger King</u> finds that extension of Florida's jurisdiction to the Michigan franchisee comports with due process because the franchisee availed itself of the opportunity to transact business with a Florida franchisor by signing a long-term franchise agreement that required payments in Florida and subjected the franchisee to a regime of regulation originating in Florida, all in pursuit of a commercial purpose.

Decided not quite two years after <u>Burger King</u>, <u>Asahi Metal Industry Co., Ltd. v. Superior Court</u>, 480 U.S. 102 (1987), tested the resilience of the aggressive standard of personal jurisdiction set by Justice Brennan's opinion in <u>Burger King</u>.  A Japanese corporation manufactured in China and sold in Taiwan a tire tube valve assembly, which the Taiwanese purchaser incorporated into tire tubes sold in California and elsewhere. For the pertinent years, Asahi's sales to the Taiwanese tire manufacturer generated 1.24 percent and 0.44 percent of Asahi's income.  Sales in California accounted for

twenty percent of sales in the United States by the Taiwanese manufacturer, which sold finished tubes throughout the world.  A sudden loss of air from a motorcycle tire, manufactured by the Taiwanese buyer and including an Asahi valve, severely injured the driver and killed the passenger.  Employing long-arm jurisdiction, which expressly extended jurisdiction to the constitutionally permissible maximum, California purported to exercise personal jurisdiction over Asahi in the ensuing litigation.  The California trial court sustained California's jurisdiction and observed, "Asahi obviously does business on an international scale.  It is not unreasonable that they defend claims of defect in their product on an international scale."  480 U.S. at 107.  Although Asahi had no presence in California, either by property, an employee, or an agent, and although Asahi conducted no business and sold no product in California, the Supreme Court of California, in an opinion by former California Chief Justice Rose Bird, upheld the purported jurisdiction because Asahi "had knowledge that a substantial number of its parts would be incorporated into finished products sold in the state."  Asahi Metal Industry Co., Ltd. v. Superior Court, 39 Cal. 3d 35, 40 (1985).

The Supreme Court formulated the question presented on certiorari:

This case presents the question whether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' "

480 U.S. at 105.  The answer to this question provoked a close reading of World-Wide Volkswagen and the resolution of a division between courts:

Some courts have understood the Due Process Clause, as interpreted in World-Wide Volkswagen, to allow an exercise of personal jurisdiction to be based on no more than the defendant's act of placing the product in the

> stream of commerce.  Other courts have understood the Due Process
> Clause and the above quoted language in <u>World-Wide Volkswagen</u> to
> require the action of the defendant to be more purposefully directed at the
> forum State than the mere act of placing a product in the stream of
> commerce.

480 U.S. at 110.  In answering this question, the Supreme Court in Justice O'Connor's

majority opinion identified, as the element necessary to an extension of personal

jurisdiction consistent with the demands of due process, an act by which a defendant

purposefully avails itself of access to a state:

> The "substantial connection," between the defendant and the forum State
> necessary for a finding of minimum contacts must come about by <u>an action</u>
> <u>of the defendant purposefully directed toward the forum State</u>.  The
> placement of a product into the stream of commerce, without more, is not
> an act of the defendant purposefully directed toward the forum State.
> Additional conduct of the defendant may indicate an intent or purpose to
> serve the market in the forum State, for example, designing the product for
> the market in the forum State, advertising in the forum State, establishing
> channels for providing regular advice to customers in the forum State, or
> marketing the product through a distributor who has agreed to serve as the
> sales agent in the forum State.  But a defendant's awareness that the
> stream of commerce may or will sweep the product into the forum State
> does not convert the mere act of placing the product into the stream into an
> act purposefully directed toward the forum State.

480 U.S. at 112 (emphasis in original) (citations omitted)  In other words, over Justice

Brennan's strenuous dissent, the Supreme Court clarified the standard after <u>World-Wide</u>

<u>Volkswagen</u> and <u>Burger King</u> and confirmed that an act of "purposeful availment" by a

non-resident defendant and not mere knowledge of the "stream of commerce" (nor,

certainly, any other mere state of mind) sufficiently connects a defendant to a state to

permit the exercise of personal jurisdiction consistent with the "traditional notions of fair

play and substantial justice" that ensure due process of law.

The Eleventh Circuit consistently applies the "minimum contacts" and "fair play"

standard evolved by the Supreme Court.  For example, in <u>Borg-Warner Acceptance</u>

Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055 (11th Cir. 1986), a decision appearing

after Burger King but before Asahi, a Georgia business negotiated and contracted in

Georgia to purchase the product of a Missouri manufacturer, which borrowed money

from Borg-Warner after the Georgia buyer executed a trade acceptance in favor of

Borg-Warner.  The Georgia buyer rejected some of the product upon delivery and

caused the return of the trade acceptance without payment.  Borg-Warner sued in

Missouri for payment, obtained a default judgment, and attempted to domesticate the

judgment in Georgia.

The Eleventh Circuit first confirms that the applicable standard derives from

International Shoe and Milliken:

> In order to determine whether the exercise of personal jurisdiction in this
> case was consistent with due process, we must examine whether Lovett &
> Tharpe had "certain minimum contacts with [the forum state] such that the
> maintenance of the suit does not offend 'traditional notions of fair play and
> substantial justice,' "  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66
> S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S.
> 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

786 F.2d at 1057.

Distinguishing between "general jurisdiction," which arises from "continuous and

systematic general business contacts between the state and a foreign corporation," and

"specific jurisdiction," which arises from particular "contacts" with the state, and

dismissing "general jurisdiction" as wholly inapplicable, Borg-Warner discusses the

particular "contacts" on which Missouri's prospective special jurisdiction depends:

> Borg-Warner asserts that there are three contacts between the transaction
> and Missouri such that the minimum contacts test of International Shoe and
> its progeny is met:  the merchandise which was the subject of the contract
> between Lovett & Tharpe and Coon was manufactured in Missouri;
> Lovett & Tharpe employees entered Missouri to return the goods; and
> Borg-Warner placed the trade acceptance with a Missouri bank for

payment.  As discussed above, Lovett & Tharpe has carried on no activity
in Missouri other than the instant transaction.  Because we conclude that
the contacts Lovett & Tharpe did have with Missouri were insufficient to
permit the constitutional exercise of personal jurisdiction over Lovett &
Tharpe, we affirm.

In order for a court to exercise jurisdiction over a defendant, "it is essential
in each case that there be some act by which the defendant purposefully
avails itself of the privilege of conducting activities within the forum State,
thus invoking the benefits and protections of its laws."  "[T]he defendant's
conduct and connection with the forum State [must be] such that he should
reasonably anticipate being haled into court there."

786 F.2d 1058.[2]  (citations omitted)  Despite some incidental contact with Missouri in the

course of a transaction to which a Georgia company agreed in Georgia and which

contemplated delivery in Georgia of a compliant and Missouri-manufactured product,

Missouri lacked personal jurisdiction over the Georgia buyer.  The Eleventh Circuit

refused enforcement of the Missouri default judgment, which was void ab initio for lack

of jurisdiction.

No act by the Georgia buyer constituted "purposeful availment" by the Georgia

buyer of the privilege of acting in Missouri.  The Georgia buyer "contacted" Missouri in

an incidental manner as an auxiliary component of the purchase in response to the

manufacturer and the manufacturer's lender and not as an act calculated by or procured

_____

[2] Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir.
2006), offers a recent iteration of the well-defined distinction between "general jurisdiction" and "specific
jurisdiction":

Personal jurisdiction can arise specifically or generally from a defendant's contacts in the
state.  General jurisdiction arises from the defendant's contacts with the forum that are not
directly related to the cause of action being litigated, while specific jurisdiction is founded
on a party's activities in the forum that are related to the cause of action alleged in the
complaint.  If a defendant is subject to the general jurisdiction of the court, the defendant
must respond in that court to any cause of action, regardless of where the cause of action
arose.

(citations omitted)  See also The Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 746-48 (11th Cir.
2002).

by the Georgia buyer.  Stated differently, the Georgia buyer's "contacts" with Missouri served the purpose of, and availed, only the Missouri manufacturer and the lender and were demanded of, or required of, and not initiated or proffered by the Georgia buyer. Doing something that another requires is hardly an act of "purposeful availment."

In <u>Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.</u>, 792 F.2d 989 (11th Cir. 1986), another case decided between <u>Burger King</u> and <u>Asahi</u>, a Florida marine salvor, responding to an inquiry, travelled to Costa Rica to assay damage to a barge, "telexed" from Florida to Costa Rica an offered price to salvage the barge, and signed in Florida an already-signed industry-standard form of acceptance returned from Costa Rica.  The salvage "did not go well," the Costa Rican entity refused to pay, and the salvor sued in Florida.  Reversing the district court's finding of personal jurisdiction over the Costa Rican company, the circuit court found inadequate to establish "minimum contacts" the presence of Costa Rican agents in Florida for negotiation (the "mere 'foot-fall' of the defendant's agents 'on the state's soil' "), the exchange between Florida and Costa Rica of offer and acceptance, and the solicitation in Florida of the salvor by the Costa Ricans.  The circuit court repaired to "purposeful availment" as the critical issue:

> This relationship will not support the exercise of <u>in personam</u> jurisdiction unless it includes "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  "Considerations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it . . . relate to whether it can be said that the defendant's actions constitute 'purposeful availment.' "  <u>Prejean v. Sonatrach, Inc.</u>, 652 F.2d 1260, 1268 (5th Cir. 1981).

(citation omitted)

"Purposeful availment" remains a <u>sine</u> <u>qua</u> <u>non</u> of personal jurisdiction over a non-resident.  <u>See, e.g.</u>, <u>Future Technology Today, Inc. v. OSF Helthcare Systems</u>, 218 F.3d 1247 (11th Cir. 2000) (finding no "minimum contacts" in Florida by an Illinois health care company that contracted with a Florida company for "Y2K" compliance services; all contract negotiations and formalities occurred in Illinois but the company's computer information and data were transmitted electronically to Florida); <u>Francosteel Corp. v. M/V Charm</u>, 19 F.3d 624 (11th Cir. 1994) (finding no "minimum contacts" with Georgia in an action arising from the loss of cargo by an unseaworthy vessel subchartered by a New York corporation from a French charterer of a Danish vessel to transport cargo from Caen, France, even though the vessel's master signed bills of lading that required delivery to Savannah, Georgia); <u>Sun Bank, N.A. v. E.F. Hutton & Co., Inc.</u>, 926 F.2d 1030 (11th Cir. 1991) (finding no "minimum contacts" with Florida by a Massachusetts securities account manager who, when contacted from Florida by a prospective lender, misrepresented the status of borrower's collateral in Massachusetts and contributed to a defaulted loan in Florida); <u>Madara v. Hall</u>, 916 F.2d 1510 (11th Cir. 1990) (finding no "minimum contacts" with Florida by an entertainer interviewed in New York by telephone from California, which resulted in a magazine's publication in Florida of the entertainer's alleged libel); <u>Charlie Fowler Evangelistic Ass'n, Inc. v. Cessna Aircraft Co.</u>, 911 F.2d 1564 (11th Cir. 1990) (finding no "minimum contacts" with Florida by a Mississippi airport service business that advertised in a regional directory available in Florida and that repaired in Mississippi a private aircraft, which flew from Florida to Mississippi and which crashed while returning to Florida because of the allegedly negligent repair); <u>Johnston v. Frank E. Basil, Inc.</u>, 802 F.2d 418 (11th Cir. 1986) (finding no "minimum

contacts" with Alabama by a non-resident who advertised in Alabama for employees to work outside Alabama and who sent an agent to Alabama to interview a prospective employee); Miami Breakers Soccer Club v. Women's United Soccer Assn., 140 F. Supp. 2d 1325 (S.D. Fla. 2001) (finding no "minimum contacts" by a Massachusetts corporation that, while using an allegedly infringing name and mark, both participated in a soccer player draft and combine in Florida and attempted to obtain a soccer franchise in Orlando).

More recently, Sloss Industries Corp. v. Eurisol, 488 F.3d 922 (11th Cir. 2007), evaluates the extent of Alabama's personal jurisdiction over Eurisol, a French purchaser of slag wool manufactured in Alabama by an Alabama seller, Sloss. Eurisol maintained no presence in Alabama and sold, neither directly nor by an agent, to any customer in Alabama. In July, 2004, Eurisol e-mailed an inquiry from France to Alabama about Sloss's product, and after a series of exchanges, including Sloss's provision to Eurisol of sample slag, Eurisol ordered Sloss's slag on several occasions in July, August, and September. Sloss delivered the product to France, and a dispute promptly arose about the quality of Sloss's product, which caused Eurisol manufacturing problems. This dispute yielded a series of exchanges and, finally, a trip by Eurisol's managing director (and his wife, a Eurisol employee) to Birmingham, Alabama, to confer with Sloss's representatives and discuss Sloss's manufacturing process. (During this visit, Eurisol requested that Sloss sell slag in Europe only to Eurisol.)

A major part of District Judge Jordan's opinion for the circuit court in Sloss, which sustains Alabama's jurisdiction, addresses the distinction between Sloss and Borg-Warner, which rejected Missouri's jurisdiction over a Georgia defendant. The

distinctions are not stark, although Eurisol purchased ten times from Alabama and Lovett purchased only once from Missouri. Eurisol's principal visited Alabama for Eurisol's purposes and at Eurisol's instance to further the commercial exchange. Mere employees of Lovett visited Missouri only once to return defective products and conclude the commercial exchange. Other minor distinctions exist, such as Eurisol's seeking an exclusive sales arrangement, which Lovett did not.

Sloss reaches a result that differs from Lovett. Somewhere in the factual difference between the two cases lies the line of theoretical demarcation between contacts with a state that are sufficient to support the state's jurisdiction over a non-resident and contacts that are not. Reviewing decisions from several circuit courts of appeals, Sloss expresses the "understanding that a minimum contacts analysis is 'immune to solution by a checklist' . . . and that contacts must be viewed both quantitatively and qualitatively . . . ." 488 F.3d at 925. However, as stated in McGow v. McCurry, 412 F.3d 1207, 1214 (11th Cir. 2005), in each instance the contacts must satisfy three criteria:

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there.

Applying the governing standard to the facts of the present case impels the observer to conclude that the Diocese has not "purposefully" availed itself of access to Florida and lacks the "minimum contacts" necessary to support personal jurisdiction in Florida consistent with due process. Brennan first contacted the Diocese in January, 2002, when Brennan requested payment for psychological counseling. Over the next

several years, Brennan and Dr. Lutzo contacted the Diocese by mail, telephone, electronic message, and facsimile. Brennan sometimes insistently requested approval of counseling, EDMR therapy, psychological testing, and residential treatment, and requested payment for counseling and other medical bills. Bishop Costello and Secreti reservedly responded to Brennan's and Dr. Lutzo's inquiries and requests but rarely (if ever) initiated contact. In requesting both Brennan's medical records and a letter eliminating the prospect of litigation, the Diocese acted only defensively and responsively. The Diocese's hesitancy to authorize ongoing treatment and the Diocese's insistence on a stated and limited treatment for a stated and limited duration, i.e., the Diocese's avoidance of an open-ended commitment to Brennan, account for the serial communication between the Diocese and Brennan. Each of the several exchanges originated in Brennan's attempt to procure a consequence in New York, i.e., to procure a beneficial commitment in New York to serve Brennan's purpose (wherever situated).

Although the governing decisional precedent yields no precise formula by which to compute the exact content of the "minimum contacts" necessary to provide due process to non-resident defendants, application to the exchange between the Diocese and Brennan of Sloss's admonition ("the contacts must be viewed both quantitatively and qualitatively") permits some telling conclusions. The Diocese is not a commercial entity, such as an insurance company or a manufacturer of products, whose contacts with a state pursue a commercial objective and create a reasonable expectation of commercial dispute in a foreign forum to which a commercial entity has chosen to direct a commercial effort. The Diocese neither sought nor initiated contact with Brennan in

Florida.  The Diocese harbors no institutional aspiration or objective purposefully

directed toward Florida.  The Diocese is without knowledge of or control over the place

of residence of a former parishioner, including Brennan, whose residence in Florida,

from the vantage of the Diocese, is utterly random.

　　　　Further, the Diocese never "exercised the privilege of doing business" in Florida

or "enjoyed the benefits and protections of the law" of Florida, as stated in International

Shoe.  The Diocese created no "affiliating circumstances" in or with Florida or

"purposely availed" itself (having neither purpose nor availment in Florida) of access to

Florida, as stated in Hanson.  The Diocese neither committed an act nor caused a

consequence that lent an air of "foreseeability" to personal jurisdiction in Florida, as

stated in World-Wide Volkswagen.  Nothing offered the Diocese "fair warning" of the

prospect of jurisdiction in Florida, as stated in Shaffer.  The Diocese never caused the

"purposeful direction" of any person, activity, or injurious consequence toward Florida,

as stated in Keeton.  The Diocese is not subject to any government regulation by

Florida or any regime of private, contractual regulation from any source in Florida, as in

Burger King.  Of course, the Diocese has not even a "mere awareness" of whether or

when a parishioner may migrate to Florida, although "mere awareness" was found

insufficient to support jurisdiction in Asahi.  The Diocese's contact with Florida, even if

properly designated as a "contact," is merely "random, fortuitous, and attenuated"--and

insufficient to satisfy due process of law.

　　　　In sum, the Diocese lacks "minimum contacts" with Florida, whether measured

qualitatively or quantitatively.  No instance appears in the authority presented by the

parties or in the authority consulted otherwise that extends personal jurisdiction in

circumstances as quantitatively and qualitatively meager as those presented in this

case.  Certainly no precedent appears to sustain jurisdiction over a non-resident, non-

commercial religious organization which lacks any presence in a state and which lacks

any arguable "contact" with the state except that initiated by the self-interested action of

a resident plaintiff and limited to a few exchanges of correspondence and the voluntary

payment of a few medical bills.

> As stated in <u>Madara v. Hall</u>, 916 F.2d 1510, 1514 (11th Cir. 1990):

> Once it has been determined that the non-resident defendant has
> purposefully established minimum contacts with the forum such that he
> should reasonably anticipate being haled into court there, these contacts
> are considered in light of other factors to decide whether the assertion of
> personal jurisdiction would comport with "fair play and substantial justice."
> These other factors are the burden on the defendant in defending the
> lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's
> interest in obtaining convenient and effective relief, the interstate judicial
> system's interest in obtaining the most efficient resolution of controversies
> and the shared interest of the states in furthering fundamental substantive
> social policies.  Minimum requirements of "fair play and substantial justice"
> may defeat the reasonableness of asserting personal jurisdiction even if the
> defendant has purposefully engaged in forum activities.  Conversely, these
> consideration may serve to establish the reasonable-ness of jurisdiction
> upon a lesser showing of minimum contacts than would otherwise be
> required.

(citations omitted)

Brennan's attempt to demonstrate "minimum contacts" by the Diocese in Florida

triggers finally the question, asserted in <u>Madara</u>, whether the "considerations" cited in

<u>Madara</u> warrant "jurisdiction upon a lesser showing of minimum contacts than otherwise

would be required."  In short, the answer is "No."  Florida has no pronounced interest in

the dispute at hand, the provenance of which is an episode many years ago in New

York and the crystallization of which is some recent exchanges of correspondence,

evenly distributed between New York and Florida.  Of course, the plaintiff has an

interest in his own convenience but his interest in his convenience in this case equals only that interest of any plaintiff in any case (in fact, any party in any case) in serving the party's convenience.  Nothing distinguishes this case or exacerbates Brennan's perceived inconvenience.  In fact, given the plaintiff's inability to compel the attendance in Florida of witnesses in New York, litigation in Florida is not in this case materially more convenient (and perhaps is less convenient) than litigation in New York (in fact, given the predictable dispute by the defendant about jurisdiction in Florida, litigation in New York would already have proven more rapid, more convenient, and less expensive--and altogether more expeditious).

Conclusion

The Diocese's motion (Doc. 6) to dismiss for lack of personal jurisdiction is **GRANTED**.  The Clerk is directed to (1) terminate any pending motion and (2) close the case.

ORDERED in Tampa, Florida, on August 20, 2008.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE